BRODSKY & SMITH, LLC
EVAN J. SMITH
9595 Wilshire Blvd.
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160

PROFY PROMISLOFF & CIARLANTO, P.C.
JEFFREY. J. CIARLANTO
JOSEPH M. PROFY
DAVID M. PROMISLOFF
100 N. 22nd Street, Unit 105
Philadelphia, PA 19103
Telephone: (215) 259-5156
Facsimile: (215) 600-2642

*Counsel for Plaintiff Stephen Silverman*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN SILVERMAN, derivatively on behalf of PAYPAL HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DANIEL H. SCHULMAN, JOHN D. RAINEY, PATRICK L.A. DUPUIS, WENCES CASARES, JONATHAN CHRISTODORO, JOHN J. DONAHOE, DAVID W. DORMAN, GAIL J. MCGOVERN, DAVID M. MOFFETT, PIERRE M. OMIDYAR and FRANK D. YEARY, <br><br> Defendants, <br><br> and <br><br> PAYPAL HOLDINGS, INC., <br><br> Nominal Defendant. | Civil Action No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934 <br><br> <u>DEMAND FOR JURY TRIAL</u> |

- 1 -

1.     Plaintiff Stephen Silverman ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties, Unjust Enrichment and Violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Complaint") for the benefit of nominal defendant PayPal Holdings, Inc. ("PayPal" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 from July 2015 through the present (the "Relevant Period").

## NATURE OF THE ACTION

2.     According to its public filings, PayPal--which was spun off from eBay Inc. ("eBay") in July 2015--operates as a technology platform company that enables digital and mobile payments on behalf of consumers and merchants worldwide.  It enables businesses of various sizes to accept payments from merchant websites, mobile devices, and applications, as well as at offline retail locations through a range of payment solutions.  The Company's platform allows customers to pay and get paid, transfer and withdraw funds to their bank accounts, and hold balances in their PayPal accounts in various currencies.

3.     PayPal was founded in 1998 and is headquartered in San Jose, California.  The Company conducted its initial public offering ("IPO") in 2002 and was acquired by eBay later that same year.

4.     Between 2002 and 2015, PayPal operated as a subsidiary of eBay.  eBay is a multinational e-commerce company providing consumer-to-consumer and business-to-consumer payment solutions via the internet.  eBay was founded in 1995 and is headquartered in San Jose, California. eBay's stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "EBAY".

5.     In 2013, PayPal (as a subsidiary of eBay) acquired the payment service provide Braintree, owner of the mobile payment service Venmo. Describing itself as a "digital wallet," Venmo is a mobile payment service that allows its users to transfer money to one another after providing

1  Venmo with personal and bank account information necessary to create a user account.

2  6.  On September 30, 2014, eBay announced that it would spin off PayPal and its services,

3  including Venmo, into a separate publicly traded company. In July 2015, eBay and PayPal completed

4  the spin-off (hereinafter referred to as the "Spin-off"), pursuant to which each holder of eBay common

5  stock as of the close of business on July 8, 2015 received one share of PayPal common stock for every

6  one share of eBay common stock held. On or about July 20, 2015, PayPal stock once again began

7  trading on the NASDAQ under the ticker symbol "PYPL".

8  7.  During the Relevant Period, Defendants (defined herein) made materially false and

9  misleading statements regarding the Company's business, prospects, and operational and compliance

10  policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose

11  that: (i) under their direction and on their watch, PayPal's Venmo service was engaged in unfair trade

12  practices; (ii) the foregoing facts, when they became known, were likely to subject the Company to

13  increased regulatory scrutiny and/or affect the profitability of PayPal's Venmo service; and (iii) as a

14  result of the foregoing, Defendants' public statements were materially false and misleading at all

15  relevant times.

16  8.  On April 28, 2016, after the market closed, Defendants caused PayPal to file a

17  quarterly report on Form 10-Q with the United States Securities and Exchange Commission (the

18  "SEC"), announcing the Company's financial and operating results for the quarter ended March 31,

19  2016. (the "Q1 2016 10-Q"). In the Q1 2016 10-Q, Defendants disclosed that the Company had

20  received a Civil Investigative Demand ("CID") from the Federal Trade Commission (the "FTC") to

21  determine whether the Company, through its Venmo service, had been engaged in any deceptive or

22  unfair practices in violation of the Federal Trade Commission Act. The Q1 2016 10-Q stated, in

23  pertinent part:

24  On March 28, 2016, we received a Civil Investigative Demand ("CID") from the
25  Federal Trade Commission ("FTC") as part of its investigation to determine whether
   we, through our Venmo service, have been or are engaged in deceptive or unfair
26  practices in violation of the Federal Trade Commission Act. The CID requests the
   production of documents and answers to written questions related to our Venmo
27  service. We are cooperating with the FTC in connection with the CID. The CID could

28

lead to an enforcement action and/or one or more consent orders, which may result in substantial costs, including legal fees, fines, penalties, and remediation expenses and actions, and could require us to change aspects of the manner in which we operate Venmo.

9.     On this news, PayPal's share price fell $0.89 per share, or 2.22%, to close at $39.18 per share on April 29, 2016.

10.     Upon information and belief, the FTC investigation remains ongoing.

11.     Additionally, on May 20, 2016, Texas Attorney General Ken Paxton announced a settlement with PayPal regarding Venmo. The Texas Attorney General's office stated, in part:

The Texas Attorney General's Consumer Protection Division conducted an investigation for potential violations of the Texas Deceptive Trade Practices Act (DTPA) and found a number of issues regarding the safety and security of the Venmo app. According to investigators, Venmo used consumers' phone contacts without clearly disclosing how the contacts would be used, did not clearly disclose how consumers' transactions and interactions with other users would be shared, and misrepresented that communications from Venmo were actually from particular Venmo users. As a result, consumers may have publically exposed private information regarding their payments. In January 2016 alone, Venmo processed $1 billion in transactions.

As part of its settlement, PayPal agrees that its Venmo app will improve disclosures to consumers regarding privacy and security. Paypal also agrees to better inform users of the safeguards available on its app, and ensure consumers understand who will be able to view their transaction information. The settlement also includes a payment of $175,000 to the State of Texas.

12.     Thus, as a result of Defendants' breaches and other misconduct, the Company has suffered damages.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this district because PayPal conducts business and maintains its principal executive offices this district. Upon information and belief, one or more of the Defendants resides in this district. Further, PayPal engages in numerous activities and conducts business here,

which had an effect in this district.

## THE PARTIES

15.     Plaintiff is a current shareholder of PayPal and has continuously held PayPal stock since the Spin-off in July 2015. Plaintiff's PayPal shares were received as a result of the Spin-off.

16.     Nominal defendant PayPal is a Delaware corporation with its principal executive offices located at 2211 North First Street, San Jose, California 95131.

17.     Defendant Daniel H. Schulman ("Schulman") has served as a director, President and Chief Executive Officer ("CEO") of PayPal since July 2015. He joined PayPal as the Company's President in September 2014 (when PayPal was still a subsidiary of eBay).

18.     Defendant John D. Rainey ("Rainey") has served as Chief Financial Officer ("CFO") and Senior Vice President of PayPal since August 2015.

19.     Defendant Patrick L.A. Dupuis ("Dupuis") served as interim CFO of PayPal from July 2015 until August 2015.

20.     Defendant Wences Casares ("Casares") has served as a director of PayPal since January 2016.

21.     Defendant Jonathan Christodoro ("Christodoro") has served as a director of PayPal since July 2015. In addition, defendant Christodoro served as a board member of eBay from March 2015 to July 2015.

22.     Defendant John J. Donahoe ("Donahoe") has served as Chairman of the Board since July 2015. Defendant Donahoe served as the President and CEO of eBay from March 2008 to July 2015, and a director of eBay from January 2008 to July 2015.

23.     Defendant David W. Dorman ("Dorman") has served as a director of PayPal since June 2015. In addition, defendant Dorman served as a board member of eBay from June 2014 to July 2015.

24.     Defendant Gail J. McGovern ("McGovern") has served as a director of PayPal since June 2015. Defendant McGovern served as a board member of eBay from March 2015 to July 2015. In addition, defendant McGovern served as a member of the Board's Audit Committee (the "Audit

Committee") during the Relevant Period.

25. Defendant David M. Moffett ("Moffett") has served as Lead Independent Director of PayPal since June 2015. Defendant Moffett was previously a board member of eBay from July 2007 to July 2015. In addition, defendant Moffett served as Chair of the Audit Committee during the Relevant Period.

26. Defendant Pierre M. Omidyar ("Omidyar") has served as a director of PayPal since July 2015. Defendant Omidyar founded eBay in September 1995 and has served as a board member of eBay Inc. since May 1996, and as Chairman of the eBay board from May 1996 to July 2015.

27. Defendant Frank D. Yeary ("Yeary") has served as a director of PayPal since July 2015. Defendant Yeary served as a board member of eBay from January 2015 to July 2015. In addition, defendant Yeary served as a member of the Audit Committee during the Relevant Period.

28. Collectively, defendants Schulman, Rainey, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary shall be referred to herein as "Defendants."

29. Collectively, defendants McGovern, Moffett and Yeary shall be referred to as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

30. By reason of their positions as officers, directors, and/or fiduciaries of PayPal and because of their ability to control the business and corporate affairs of PayPal and its subsidiaries, Defendants owed PayPal and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage PayPal in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of PayPal and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to PayPal and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and its subsidiaries and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

31. Defendants, because of their positions of control and authority as directors and/or

- 6 -

officers of PayPal, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with PayPal, each of the Defendants had knowledge of material non-public information regarding the Company.

32. To discharge their duties, the officers and directors of PayPal were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company and its subsidiaries. By virtue of such duties, the officers and directors of PayPal were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company and its subsidiaries were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company and its subsidiaries were operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c. When put on notice of problems with the Company's or its subsidiaries' business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

33. Additionally, the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), which expressly applies to all Defendants named herein, states the following:

**COMPLIANCE WITH THE LAW**
We are accountable for our actions and we honor our commitments.

Our shared goal of honest and ethical action in everything we do drives our success. We are committed to ensuring that every action we take is in full compliance with the law – and in keeping with our ethics.

        \*      \*      \*

**MAKING ETHICAL DECISIONS**

When you face difficult decisions at PayPal, take the time to think and consider the legal and ethical issues. Don't give in to pressure and rush your decision.

Carefully consider the implications of your actions. Always ask:
• Is it honest and fair?
• Is it consistent with the Code and the law?
• Does it make you feel good about yourself and the Company?
• Would you feel comfortable reading about your action if it is reported in the media?

\*      \*      \*

**ACCURATE ACCOUNTS AND RECORDS**
We have an obligation to our business, stockholders and others who rely on us, to ensure that our accounts and records are always complete, accurate, timely, and understandable. These records are critical for internal decision making, and for reporting to government agencies and the market. Accurate records protect our reputation for integrity.

This means that we never falsify, forge, backdate, or improperly alter any Company document. We ensure that all transactions are lawful, recorded in the proper account, and in accordance with all Company internal controls.
All reports to regulatory authorities must be full, fair, accurate, timely and understandable.

\*      \*      \*

**PRIVACY**
Customers who entrust us with their personal information expect us to protect their privacy. Privacy matters at PayPal. We all must be focused on our customers, compliance and doing the right thing. Depending on your job responsibilities you may have access to our customers' personal data, including their contact details, financial account information and transaction data. We must safeguard our customers' information. We collect, access, use, store, transfer and share our customers' information only for legitimate business purposes, and always in accordance with our privacy and information security policies and applicable laws, rules and regulations, including data protection laws. In particular, PayPal has made commitments to data protection regulators in Europe that we, globally, will comply with certain binding rules designed to protect our Users' Personal Information.

We do not share customer information with third parties, or any colleague who doesn't have a business need to know.

If there is a legitimate business need to share confidential information with a third party, they must first enter into an appropriate legal agreement, with confidentiality, privacy and security provisions, approved by the PayPal Legal and Privacy Teams.

\*      \*      \*

**ADVERTISING AND MARKETING**
Every claim in our advertisements and marketing materials must be accurate, objective and verifiable. This means that we must research and document our claims prior to publication. Laws governing comparative advertising, including pricing, vary from country to country, so it's important to obtain guidance from Legal when making such claims to ensure that we comply with applicable laws.

Advertising and marketing using social media also is subject to various regulations. Please consult our Social Media Policy and Legal for more information.

We do not make false or misleading claims. Legal can provide guidance if you are unsure whether something is false or misleading.

*     *     *

**PUBLIC STATEMENTS AND ENDORSEMENTS**
We speak with one voice when communicating about PayPal to the media, financial analysts, or investors. Inaccurate statements can create serious risks for the Company, including claims of false advertising, misrepresentation, breach of contract, securities fraud and antitrust violations.

All public statements and endorsements or information about PayPal, our products, or our business prospects must be coordinated and approved in advance with Corporate Communications. Information related to the Company's financial performance must be directed to Investor Relations.

34.     Pursuant to the terms of the Audit Committee's Charter, the Audit Committee Defendants were responsible for, *inter alia*: (i) overseeing the Company's corporate accounting and financial reporting practices; (ii) overseeing the Company's compliance with legal and regulatory requirements; (iii) overseeing the independent auditor's qualifications and independence; (iv) overseeing the performance of the Company's internal audit function and independent auditors; (v) overseeing the quality and integrity of the Company's financial statements and reports; (vi) reviewing and approving all audit engagement fees and terms, as well as all non-audit engagements with the independent auditors; (vii) producing the report that the rules of the SEC require to be included in the Company's annual proxy statement; and (viii) oversight of the Code of Ethics as applied to the Company's directors and executive officers.

**SUBSTANTIVE ALLEGATIONS**

**A.**     **Overview of the Company and Pre-Spin-off Background Statements**

35.     According to its public filings, PayPal operates as a technology platform company that enables digital and mobile payments on behalf of consumers and merchants worldwide. It enables businesses of various sizes to accept payments from merchant websites, mobile devices, and applications, as well as at offline retail locations through a range of payment solutions. The Company's platform allows customers to pay and get paid, transfer and withdraw funds to their bank accounts, and hold balances in their PayPal accounts in various currencies.

36.     Between 2002 and 2015, PayPal operated as a subsidiary of eBay, a multinational ecommerce company providing consumer-to-consumer and business-to-consumer payment solutions via the internet.

37.     On December 19, 2013, eBay issued a press release entitled "eBay Inc. Completes Acquisition of Global Payments Innovator Braintree." The press release stated, in part:

> eBay Inc. (NASDAQ: EBAY) today announced it completed its previously announced acquisition of Braintree, the innovative global payment platform powering the next generation of leading online and mobile-first startups. In accordance with the terms of the acquisition agreement announced September 26, 2013, eBay acquired Braintree for total consideration of approximately $800 million in cash.
>
> Braintree will now operate as a separate service within PayPal under the leadership of Braintree CEO Bill Ready, who will report to PayPal President David Marcus and has joined PayPal's executive staff.
>
> Braintree has become the payment platform of choice for next-generation innovators like Airbnb, OpenTable, HotelTonight and Uber, transforming consumer experiences through mobile devices. PayPal plans to integrate with Braintree only in ways that will benefit customers and support Braintree's growth. Venmo, Braintree's mobile application that gives people an easy way to pay each other using their mobile devices and leveraging social networks, is part of the acquisition and will remain a separate app.

38.     On January 31, 2014, eBay filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K"). For the quarter, eBay reported net income $850 million, or $0.65 per diluted share, on revenue of $4.53 billion, compared to net income of $751 million, or $0.57 per

- 10 -

diluted share, on revenue of $3.99 billion for the same period in the prior year. For 2013, eBay reported net income of $2.86 billion, or $2.18 per diluted share, on revenue of $16.05 billion, compared to net income of $2.61 billion, or $1.99 per diluted share, on revenue of $14.07 billion for 2012.

39.     In the 2013 10-K, with respect to Venmo's compliance with applicable laws and regulations, eBay stated, in part:

> To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. Braintree's subsidiary Venmo provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash, but Venmo is also licensed as a money transmitter in California, has applied for a license in Hawaii, and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on its investment of customer funds, reporting requirements, bonding requirements, and inspection by state regulatory agencies. If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices, or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo. Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

40.     On May 1, 2014, eBay filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). For the quarter, eBay reported a net loss of $2.33 billion, or $1.82 per diluted share, on revenue of $4.26 billion, compared to net income of $677 million, or $0.51 per diluted share, on revenue of $3.75 billion for the same period in the prior year.

41.     In the Q1 2014 10-Q, with respect to Venmo's compliance with applicable laws and regulations, eBay stated, in part:

> To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two

remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash. Venmo is also licensed as a money transmitter in California and Washington, has applied for a license in Hawaii and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo. Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

*    *    *

Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system. Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau), the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and Bill Me Later to make additional disclosures to their users and to impose new restrictions on certain of their activities. For example, in January 2012, the Consumer Financial Protection Bureau finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments. The Consumer Financial Protection Bureau also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints. These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may otherwise adversely impact our business.

42.      On July 18, 2014, eBay filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q"). For the quarter, eBay reported net income of $676 million, or $0.53 per diluted share, on revenue of $4.1 billion, compared to net income of $640 million, or $0.49 per diluted share,

- 12 -

on revenue of $3.88 million for the same period in the prior year.

43.     In Q2 2014 10-Q, with respect to Venmo's compliance with applicable laws and regulations, eBay stated, in part:

> To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash. Venmo is also licensed as a money transmitter in California and Washington, has applied for a license in Hawaii and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo. Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

> *     *     *

> Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system. Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau), the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and Bill Me Later to make additional disclosures to their users and to impose new restrictions on certain of their activities. For example, in January 2012, the Consumer Financial Protection Bureau finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments. The Consumer Financial Protection Bureau also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints. These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may

otherwise adversely impact our business.

44. On October 16, 2014, eBay filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"). For the quarter, eBay reported net income of $673 million, or $0.54 per diluted share, on revenue of $2.15 billion, compared to net income of $689 million, or $0.53 per diluted share, on revenue of $3.89 billion for the same period in the prior year.

45. In the Q3 2014 10-Q, with respect to Venmo's compliance with applicable laws and regulations, eBay stated, in part:

> To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of PayPal, Inc.. Venmo is also licensed as a money transmitter in California, Vermont and Washington and has applied for a license in Hawaii and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo. Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

> \* \* \*

> Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system. Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau, or CFPB), the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and PayPal Credit to make additional disclosures to their users and to impose new restrictions on certain of their activities. For example, in January 2012, the CFPB finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error

- 14 -

resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments. The CFPB also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints. These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may otherwise adversely impact our business.

46. On February 6, 2015, eBay filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). For the quarter, eBay reported net income of $1.02 billion, or $0.82 per diluted share, on revenue of $2.32 billion, compared to net income of $850 million, or $0.65 per diluted share, on revenue of $4.53 billion for the same period in the prior year. For 2014, eBay reported net income of $46 million, or $0.04 per diluted share, on revenue of $8.8 billion, compared to net income of $2.86 billion, or $2.18 per diluted share, on revenue of $16.05 billion for 2013.

47. In the 2014 10-K, with respect to Venmo's compliance with applicable laws and regulations, eBay stated, in part:

> PayPal has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. PayPal's subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, PayPal and Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change their business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if they violate these laws or regulations.

48. On April 23, 2015, eBay filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, eBay reported net income of $626 million, or $0.52 per diluted share, on revenue of $2.06 billion, compared to a net loss of $2.33 billion, or $1.82 per diluted share, on revenue of $4.26 billion for the same period in the prior year.

49. In the Q1 2015 10-Q, with respect to Venmo's compliance with applicable laws and

regulations, eBay stated, in part:

> PayPal has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. PayPal's subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, PayPal and Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change their business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if they violate these laws or regulations.

50.     In July 2015, eBay completed the spin-off of PayPal into a standalone, publicly traded company. Pursuant to the spin-off, each holder of eBay common stock as of the close of business on July 8, 2015 received one share of PayPal common stock for every one share of eBay common stock held. On July 20, 2015, following the completion of its spin-off from eBay, PayPal's common shares began trading once again on the NASDAQ.

**B.     Defendants' Relevant Period False and Misleading Statements**

51.     On July 29, 2015, Defendants caused PayPal to file a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, Defendants reported net income of $305 million, or $0.25 per diluted share, on revenue of $2.3 billion, compared to net income of $281 million, or $0.23 per diluted share, on revenue of $1.98 billion for the same period in the prior year.

52.     In the Q2 2015 10-Q, with respect to Venmo's compliance with applicable laws and regulations, Defendants caused PayPal to merely state, in part:

> PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. Our subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Venmo are subject to restrictions with respect to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies.
>
> Accordingly, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business

practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if we violate these laws or regulations.

53.     The Q2 2015 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") by defendants Schulman and Dupuis, who stated:

I, [Daniel H. Schulman/Patrick L.A. Dupuis], certify that:

1. I have reviewed this report on Form 10-Q of PayPal Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*    *    *

I, [Daniel H. Schulman/Patrick L.A. Dupuis], hereby certify pursuant to 18 U.S.C. Section 1350 adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

(i) The accompanying quarterly report on Form 10-Q for the quarter ended June 30, 2015 fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and

(ii) The information contained in such report fairly presents, in all material respects, the financial condition and results of operations of PayPal Holdings, Inc.

54.    On October 29, 2015, Defendants caused PayPal to file a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). For the quarter, Defendants caused PayPal to report net income of $301 million, or $0.25 per diluted share, on revenue of $2.26 billion, compared to net income of $234 million, or zero per diluted share, on revenue of $1.98 billion for the same period in the prior year.

55.    In the Q3 2015 10-Q, with respect to Venmo's compliance with applicable laws and regulations, Defendants caused PayPal to merely state, in part:

> In the United States, PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the states where it is required, as well as in the District of Columbia, the U.S. Virgin Islands and Puerto Rico. Our subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states, and acts as an authorized delegate and agent of PayPal in the states where Venmo is not directly licensed. As licensed money transmitters, PayPal and Venmo are subject to restrictions with respect

to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, if we violate these laws or regulations, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial costs.

56. The Q3 2015 10-Q contained signed SOX Certifications by defendants Schulman and Rainey, which were substantially similar to those set forth above.

57. On February 11, 2016, Defendants caused PayPal to file an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants. For the quarter, Defendants caused PayPal to report net income of $367 million, or $0.30 per diluted share, on revenue of $2.56 billion, compared to net income of $286 million, or zero per diluted share, on revenue of $2.19 billion for the same period in the prior year. For 2015, Defendants caused PayPal to report net income of $1.23 billion, or $1.00 per diluted share, on revenue of $9.25 billion, compared to net income of $419 million, or $0.31 per diluted share, on revenue of $8.03 billion for 2014.

58. In the 2015 10-K, with respect to Venmo's compliance with applicable laws and regulations, Defendants caused PayPal to merely state, in part:

> In the United States, PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the states where it is required, as well as in the District of Columbia, the U.S. Virgin Islands and Puerto Rico. This license includes not only the PayPal branded products and services in these states, but also our Venmo branded products and services. Our subsidiary, Xoom, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Xoom are subject to restrictions with respect to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, if we violate these laws or regulations, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial costs.

59. The 2015 10-K contained SOX Certifications signed by defendants Schulman and Rainey, which were substantially similar to those set forth above.

60. Defendants' statements referenced above were materially false and misleading because Defendants failed to disclose material adverse facts about the Company's business, prospects,

- 19 -

and operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that under their direction and on their watch: (i) PayPal's Venmo service was engaged in unfair trade practices; (ii) the foregoing facts, when they became known, were likely to subject the Company to increased regulatory scrutiny and/or affect the profitability of PayPal's Venmo service; and (iii) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

61.     On April 14, 2016, Defendants caused the Company to file with the SEC and disseminate to shareholders a Proxy Statement on Form DEF 14A (the "2016 Proxy"). The 2016 Proxy described director responsibilities, the duties of each committee, Board risk management, sought an advisory vote on executive compensation, and provided information about the director nominees up for election.

62.     In the 2016 Proxy, Defendants claimed that executive compensation is based on a "pay for performance model."

63.     Further, the 2016 Proxy states that the Company's clawback policy is applicable to all senior executive officers and permits the Board's Compensation Committee "to require forfeiture or reimbursement of incentive compensation," if that executive violates that Company's Code of Conduct or commits "an action or omission" that "results in material financial or reputational harm to the Company." The 2016 Proxy states, in relevant part:

> Our clawback policy is applicable to each officer employed as a Vice President or in a more senior position, and permits the Committee to require forfeiture or reimbursement of incentive compensation, which includes any cash incentive award, equity award, or equity-based award paid or awarded to any covered employee during the period in which he or she is designated as a covered employee, if (i) an action or omission by the covered employee constitutes a material violation of the Code of Business Conduct; or (ii) an action or omission by the covered employee results in material financial or reputational harm to the Company.

64.     Finally, the 2016 Proxy touted PayPal's "strong governance standards."

65.     However, in the 2016 Proxy, Defendants misrepresented and/or failed to disclose that under their direction and on their watch: (i) PayPal's Venmo service was engaged in unfair trade practices; (ii) the foregoing facts, when they became known, were likely to subject the Company to

- 20 -

increased regulatory scrutiny and/or affect the profitability of PayPal's Venmo service; and (iii) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times..

66. Moreover, due to the fact that Defendants were causing or allowing the Company to violate applicable laws and or regulations (and thus violate the Code of Conduct and cause material financial and/or reputational harm to the Company), it is clear that they were not "paying for performance." Additionally, upon information and belief, despite these violations of the Code of Conduct and other financial/reputational harm to the Company by Defendants, no compensation has been clawed back from any of the Defendants.

## C. The Truth Begins to Emerge

67. On April 28, 2016, after the market closed, Defendants caused PayPal to file the Q1 2016 10-Q, announcing the Company's financial and operating results for the quarter ended March 31, 2016. In the Q1 2016 10-Q, Defendants disclosed that the Company had received a CID from the FTC to determine whether the Company, through its Venmo service, had been engaged in any deceptive or unfair practices in violation of the Federal Trade Commission Act. The Q1 2016 10-Q stated, in pertinent part:

> On March 28, 2016, we received a Civil Investigative Demand ("CID") from the Federal Trade Commission ("FTC") as part of its investigation to determine whether we, through our Venmo service, have been or are engaged in deceptive or unfair practices in violation of the Federal Trade Commission Act. The CID requests the production of documents and answers to written questions related to our Venmo service. We are cooperating with the FTC in connection with the CID. The CID could lead to an enforcement action and/or one or more consent orders, which may result in substantial costs, including legal fees, fines, penalties, and remediation expenses and actions, and could require us to change aspects of the manner in which we operate Venmo.

68. On this news, PayPal's share price fell $0.89 per share, or 2.22%, to close at $39.18 on April 29, 2016.

69. Additionally, on May 20, 2016, Texas Attorney General Ken Paxton announced a settlement with PayPal regarding Venmo. The Attorney General's office stated, in part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

The Texas Attorney General's Consumer Protection Division conducted an investigation for potential violations of the Texas Deceptive Trade Practices Act (DTPA) and found a number of issues regarding the safety and security of the Venmo app. According to investigators, Venmo used consumers' phone contacts without clearly disclosing how the contacts would be used, did not clearly disclose how consumers' transactions and interactions with other users would be shared, and misrepresented that communications from Venmo were actually from particular Venmo users. As a result, consumers may have publically exposed private information regarding their payments. In January 2016 alone, Venmo processed $1 billion in transactions.

As part of its settlement, PayPal agrees that its Venmo app will improve disclosures to consumers regarding privacy and security. Paypal also agrees to better inform users of the safeguards available on its app, and ensure consumers understand who will be able to view their transaction information. The settlement also includes a payment of $175,000 to the State of Texas.

70. According to the Company's most recent Form 10-Q filed with the SEC on October 25, 2016, the FTC investigation remains ongoing.

71. Thus, as a result of Defendants' actions, the Company has been damaged. These damages include (but are not limited to) becoming the subject of the FTC investigation (which could result in significant costs and fines), becoming the subject of the investigation by the Texas Attorney General (and the resulting settlement), and severe loss of reputation and goodwill.

## DERIVATIVE AND DEMAND ALLEGATIONS

72. Plaintiff brings this action derivatively in the right and for the benefit PayPal to redress the breaches of fiduciary duty and other violations of law by Defendants.

73. Plaintiff will adequately and fairly represent the interests of PayPal and its shareholders in enforcing and prosecuting its rights.

74. The Board currently consists of the following nine (9) directors: defendants Schulman, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the reasons that follow.

75. The principal professional occupation of defendant Schulman is his employment with PayPal as its President and CEO, pursuant to which he receives substantial monetary compensation and other benefits. In addition, according to the 2016 Proxy, Defendants have admitted that defendant

- 22 -

Schulman is not independent. Thus, defendant Schulman lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

76.     The principal professional occupation of defendant Donahoe was his employment with eBay (up to the time of the Spin-off) as its President and CEO, pursuant to which he received substantial monetary compensation and other benefits. In addition, according to the 2016 Proxy, Defendants have admitted that defendant Donahoe is not independent. Thus, defendant Donahoe lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

77.     Defendants Schulman, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary (*i.e.,* the entire Board) served as directors of the Company during some or all of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein. In fact, defendants Schulman, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary (a majority of the Board) served as officers and/or directors of eBay during the period when (upon information and belief) the illicit Venmo activity was occurring while Venmo was a subsidiary of eBay. The statements, actions and omissions regarding Venmo's compliance with all applicable laws and regulations, that defendants Schulman, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary caused or allowed to be made repeatedly during the Relevant Period were an integral aspect of the Company's core operations. It was these very actions and statements made and/or caused or allowed to be made by defendants Schulman, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary that caused the Company to be the subject of governmental investigations and to suffer severe reputational harm, as set forth herein. This was in violation of (among other things) these Defendants' fiduciary duties of good faith and loyalty, as well as the Code of Ethics. Thus, defendants Schulman, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary (the entire Board) each faces a substantial likelihood of liability for their acts in connection with these actions and statements, rendering a demand upon them futile.

78.    During the Relevant Period, defendants McGovern, Moffett and Yeary served as members of the Audit Committee.  Pursuant to the Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, overseeing: the Company's corporate accounting and financial reporting practices, the Company's compliance with legal and regulatory requirements, the quality and integrity of the Company's financial statements and reports, and oversight of the Code of Ethics as applied to the Company's directors and executive officers. Defendants McGovern, Moffett and Yeary breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures, caused the above-discussed internal control failures, and caused or allowed the illicit activity described herein. Therefore, defendants McGovern, Moffett and Yeary face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

79.    Defendants Schulman, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary (*i.e.,* the entire Board) each signed the false and misleading 2015 10-K.  The 2015 10-K, signed and authorized by defendants Schulman, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary, was false and misleading because it failed to disclose (among other things) that under Defendants' direction and on their watch: (i) PayPal's Venmo service was engaged in unfair trade practices; (ii) the foregoing facts, when they became known, were likely to subject the Company to increased regulatory scrutiny and/or affect the profitability of PayPal's Venmo service; and (iii) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.  As a result, defendants Schulman, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary (the entire Board) each face a substantial likelihood of liability for their actions described herein, rendering any demand upon them futile.

**COUNT I**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES**

80.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

- 24 -

81. As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that PayPal disseminated accurate, truthful and complete information to its shareholders.

82. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to PayPal shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

83. As alleged herein, each of the Defendants had a fiduciary duty to, among other things, ensure that the Company and its subsidiaries were operated in a lawful manner and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's and/or its subsidiaries' business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

84. Defendants willfully ignored the obvious and pervasive problems with PayPal's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

85. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence PayPal, for which they are legally responsible. In particular, Defendants abused their positions of authority by causing or allowing PayPal to misrepresent material facts regarding its business practices and operations, financial position and business prospects.

86. Defendants had a duty to PayPal and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of PayPal and its subsidiaries.

87. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of PayPal and its subsidiaries in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care,

diligence and candor in the management and administration of PayPal's affairs and in the use and preservation of PayPal's assets.

88. During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused PayPal to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to PayPal, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged PayPal.

89. As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

90. As a result of the misconduct alleged herein, Defendants are liable to the Company.

91. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

**COUNT II**
**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

92. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93. By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of PayPal in the form of salaries, bonuses, and other forms of compensation.

94. Plaintiff, as a shareholder and representative of PayPal, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT III**
**AGAINST DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934**

95. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of

- 26 -

the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the 2016 Proxy violated §14(a) and Rule 14a-9 because it omitted material facts regarding the Company's compliance, operations and future prospects.

97.     The 2016 Proxy was false and misleading because among other things, Defendants failed to disclose that: (i) PayPal's Venmo service (under Defendants' direction and on their watch) was engaged in unfair trade practices; (ii) the foregoing facts, when they became known, were likely to subject the Company to increased regulatory scrutiny and/or affect the profitability of PayPal's Venmo service; and (iii) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

98.     Additionally, even though the 2016 Proxy sought shareholder votes for, *inter alia*, director nominations and a long-term executive compensation program, it failed to disclose that the Company's internal controls were not sufficient, and that Defendants had caused or allowed the illicit practices described herein.

99.     Further, the 2016 Proxy states that the Company's clawback policy is applicable to all senior executive officers and permits the Board's Compensation Committee "to require forfeiture or reimbursement of incentive compensation," if that executive violates that Company's Code of Conduct or commits "an action or omission" that "results in material financial or reputational harm to the Company."

100.    The 2016 Proxy was likewise false and misleading because notwithstanding this purported clawback policy, upon information and belief, no compensation was ever actually clawed back despite the fact that Defendants were causing or allowing the Company to violate applicable laws and or regulations (and thus violate the Code of Conduct and cause material financial and/or reputational harm to the Company).

101.    In the exercise of reasonable care, Defendants should have known that the statements contained in the 2016 Proxy were materially false and misleading, and/or that the 2016 Proxy omitted

- 27 -

material information. The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2016 Proxy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B. Directing PayPal to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C. Awarding to PayPal restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 12, 2017            **BRODSKY & SMITH, LLC**

EVAN J. SMITH

9595 Wilshire Blvd.
Beverly Hills, CA 90212

- 28 -

Telephone: (877) 534-2590
Facsimile: (310) 247-0160

**PROFY PROMISLOFF & CIARLANTO, P.C.**
JEFFREY. J. CIARLANTO
JOSEPH M. PROFY
DAVID M. PROMISLOFF
100 N. 22nd Street, Unit 105
Philadelphia, PA 19103
Telephone: (215) 259-5156
Facsimile: (215) 600-2642

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
ALFRED G. YATES, JR.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033

Attorneys for Plaintiff

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934