1
2
3
4
5
6
7
8

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
FELIPE J. ARROYO (163803)
SHANE P. SANDERS (237146)
SCOTT F. TEMPLETON (246872)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@ robbinsarroyo.com
farroyo@ robbinsarroyo.com
ssanders@robbinsarroyo.com
stempleton@robbinsarroyo.com

9

*Co-Lead Counsel for Plaintiffs*

10

[Additional Counsel on Signature Page]

11
12

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

13
14

IN RE PAYPAL HOLDINGS, INC.
SHAREHOLDER DERIVATIVE LITIGATION

Lead Case No. 3:17-cv-00162-RS

(Consolidated with No. 3:17-cv-02206-RS;
3:17-cv-02428-RS; and 5:17-cv-02446-RS)

15
16
17

This Document Relates To:

ALL ACTIONS

**VERIFIED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT**

18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Edith Liss, Steve Sims, Stephen Silverman, Iron Workers Local No. 25 Pension Fund and Steve Seeman (collectively, "Plaintiffs") by and through their attorneys, submit this Verified Amended Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  The allegations herein are based upon Plaintiffs' personal knowledge as to their own facts, and upon information and belief as to all other matters, based on, among other things, the investigation made by and through their counsel and a review of publicly available information, including counsel's review of press releases and U.S. Securities and Exchange Commission ("SEC") filings.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought on behalf of nominal defendant PayPal Holdings, Inc. ("PayPal" or the "Company") against certain of its officers and directors for violation of federal securities law, breaches of fiduciary duties, and other wrongdoing.  These wrongs resulted in billions of dollars in damages to PayPal's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law.

2.     In 2013, eBay Inc. ("eBay") bought startup company, Braintree, for $800 million in cash.  Braintree helped a number of web and mobile device companies process payments. However, the company was mostly known for its Venmo smartphone application, which allowed people to pay each other through text messages.  eBay placed Braintree, and its application Venmo, under its then-wholly owned subsidiary, PayPal.  In 2015, eBay spun off PayPal into a separate publicly traded company.  As part of the spinoff, eBay's stockholders received one share of PayPal stock for each share of eBay stock that they owned.

3.     Unbeknownst to the public in general or eBay and PayPal's outside stockholders, Venmo was engaged in unfair and deceptive business practices in violation of state and federal law.  At a minimum, Venmo used its customers' phone contacts without disclosing how those contacts would be used, did not clearly disclose how customers' transactions and interactions with other users would be shared, and misrepresented that communication from Venmo was

1 | actually from a Venmo customer.  Venmo's illegal actions led to inflated results for PayPal, first
2 | as a subsidiary of eBay and then later as a standalone company, as the Company's results did not
3 | represent its business as if it operated legally and there was no indication of Venmo's illegal
4 | practices in any of PayPal's public filings.

5 |     4.    Venmo's illegal practices recently led to an action by the State of Texas against
6 | the Company.  PayPal settled this action with a payment to Texas and certain improvements in
7 | Venmo's disclosures to its customers.  In addition, the Federal Trade Commission ("FTC") has
8 | initiated an investigation to determine whether Venmo engaged in deceptive or unfair practices
9 | in violation of the Federal Trade Commission Act.  Thus far, the FTC has served a civil
10 | investigative demand ("CID") on PayPal, demanding the Company produce documents and
11 | provide answers to written questions about Venmo's service.

12 |     5.    In the wake of the partial disclosure of Venmo's illegal business practices,
13 | PayPal's stock plunged, erasing over $1 billion in market capitalization in a single day.

14 |     6.    Further, after PayPal received the CID, but before its disclosure to the public, the
15 | Board of Directors (the "Board") of PayPal issued a proxy statement to the Company's
16 | stockholders asking that they vote to reelect the members of the Board.  The Board made no
17 | mention of the CID or Venmo's illegal practices in the proxy.  In fact, the Board did just the
18 | opposite, littering the proxy with discussion about the Company's strong corporate governance
19 | and the Board members' monitoring of PayPal.  The Board members made these statements to
20 | justify their continued role as directors of the Company.  As the members of the Board should
21 | have known, however, the Company was engaged in illegal activities and did not have "strong"
22 | governance, rendering these proxy statements false and misleading.  These negligently-made
23 | material misstatements are a violation of federal securities laws.  The statements were also an
24 | essential link to the Board member's reelection.

25 |     7.    In light of the above, Plaintiffs now bring this action to hold the Individual
26 | Defendants (as defined herein) accountable for their illegal actions.

27 |
28 |

1        8.     PayPal's Board has not taken legal action against defendants for the misconduct

2 alleged herein.   Accordingly, between January and October 2017, Plaintiffs commenced

3 shareholder derivative litigation on behalf of PayPal seeking to hold defendants accountable for

4 the damages sustained by the Company.  PayPal moved to dismiss the operative complaint on the

5 grounds that plaintiffs had not made a demand upon the PayPal Board.  On January 18, 2018 the

6 Court dismissed the complaint for failure to make a demand on the PayPal Board, with leave to

7 amend.  On February 15, 2018, to cure this perceived pleading defect, Plaintiffs served a

8 litigation demand (the "Demand") upon the PayPal Board and thereafter forwarded the Demand

9 to counsel representing PayPal and the Individual Defendants.  A copy of the Demand is attached

10 hereto as Exhibit A.

11 **JURISDICTION AND VENUE**

12        9.     Pursuant to Article III, Section 2 of the United States Constitution and 28 U.S.C.

13 §1331 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction

14 over the claims asserted herein for violations of section 14(a) of the Exchange Act.  This Court

15 has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.  The other

16 claims in this action are so related to the section 14(a) claims that fall within this Court's original

17 jurisdiction that they form part of the same case or controversy under Article III, Section 2 of the

18 United States Constitution.

19       10.    This Court has jurisdiction over each defendant named herein because each

20 defendant is either a corporation that conducts business in and maintains operations in this

21 District, or is an individual who has sufficient minimum contacts with this District to render the

22 exercise of jurisdiction by the District courts permissible under traditional notions of fair play and

23 substantial justice.

24       11.    Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because:

25 (i) PayPal maintains its principal place of business in this District; (ii) one or more of the

26 defendants either resides in or maintains executive offices in this District; (iii) a substantial

27 portion of the transactions and wrongs complained of herein, including the defendants' primary

28

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
Lead Case No. 3:17-cv-00162-RS

1 participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in

2 violation of fiduciary duties owed to PayPal, occurred in this District; and (iv) defendants have

3 received substantial compensation in this District by doing business here and engaging in

4 numerous activities that had an effect in this District.

### INTRADISTRICT ASSIGNMENT

6    12.    This action is properly assigned to the San Jose division of this Court.

### THE PARTIES

**Plaintiffs**

9    13.    Plaintiff Edith Liss received her PayPal stock in the Company's spinoff from eBay

10 and has continuously held PayPal stock since that time.

11    14.    Plaintiff Steve Sims received his PayPal stock in the Company's spinoff from

12 eBay and has continuously held PayPal stock since that time.

13    15.    Plaintiff Stephen Silverman received his PayPal stock in the Company's spinoff

14 from eBay and has continuously held PayPal stock since that time.

15    16.    Plaintiff Iron Workers Local No. 25 Pension Fund received its PayPal stock in the

16 Company's spinoff from eBay and has continuously held PayPal stock since that time.

17    17.    Plaintiff Steve Seeman received his PayPal stock in the Company's spinoff from

18 eBay and has continuously held PayPal stock since that time.

**Nominal Defendant**

20    18.    Nominal Defendant PayPal is a Delaware corporation with principal executive

21 offices located at 2211 North First Street, San Jose, California.   PayPal offers technology

22 platforms which allow consumers and merchants to make digital and mobile payments.  PayPal's

23 technology platforms include PayPal, PayPal Credit, Braintree, Venmo, Xoom and Paydiant.

24 PayPal generates revenues by charging fees for providing transaction processing and other

25 payment-related services.   On July 17, 2015, PayPal became an independent publicly traded

26 company through the pro rata distribution by eBay of 100% of the outstanding common stock of

PayPal to eBay's stockholders.   As of December 31, 2016, PayPal employed approximately 18,100 people worldwide.

**Defendants**

19.     Defendant Daniel Schulman ("Schulman") is PayPal's President, Chief Executive Officer ("CEO"), and a director and has been since July 2015.  Defendant Schulman was also PayPal's President and CEO-Designee from September 2014 to July 2015.  Defendant Schulman knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings.  PayPal paid defendant Schulman the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $1,000,000 | $13,453,388 | - | $3,140,000 | $1,340,953 | $18,934,341 |
| 2015 | $942,308 | $8,825,674 | $1,537,111 | $2,374,615 | $764,783 | $14,444,491 |

20.     Defendant John Rainey ("Rainey") is PayPal's Senior Vice President and Chief Financial Officer ("CFO") and has been since August 2015.  Defendant Rainey knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings.  PayPal paid defendant Rainey the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $650,000 | $4,139,520 | - | $979,875 | $4,165,313 | $9,934,708 |
| 2015 | $212,500 | $8,369,049 | $706,251 | $241,188 | $1,153,558 | $10,682,546 |

21.     Defendant John Donahoe ("Donahoe") is PayPal's Chairman of the Board and a director and has been since July 2015.  Defendant Donahoe was also eBay's President and CEO from March 2008 to July 2015 and an eBay director from January 2008 to July 2015.  Defendant Donahoe knowingly or recklessly made improper statements in the Company's press releases and public filings.  While in possession of material, nonpublic information concerning PayPal's true business health, defendant Donahoe sold 1,830,584 shares of his stock for $70,273,773.04 in proceeds.  PayPal paid defendant Donahoe the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $180,000 | $320,003 | $500,003 |
| 2015 | $90,000 | - | $90,000 |

22.     Defendant David Moffett ("Moffett") is PayPal's Lead Independent Director and a director has been since June 2015.  Defendant Moffett was also an eBay director from July 2007 to July 2015.  Defendant Moffett is the Chairman of PayPal's Audit, Risk and Compliance Committee and has been since July 2015.  Defendant Moffett knowingly or recklessly made improper statements in the Company's press releases and public filings.  PayPal paid defendant Moffett the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $193,000 | $220,002 | $413,002 |
| 2015 | $68,500 | - | $68,500 |

23.     Defendant Pierre Omidyar ("Omidyar") is a PayPal director and has been since July 2015, and an eBay director and has been since May 1996.  Defendant Omidyar founded eBay in September 1995 and was also eBay's Chairman of the Board of Directors from May 1996 to July 2015.  Defendant Omidyar knowingly or recklessly made improper statements in the Company's press releases and public filings.

24.     Defendant Gail McGovern ("McGovern") is a PayPal director and has been since June 2015.  Defendant McGovern was also an eBay director from March 2015 to July 2015.  Defendant McGovern is a member of PayPal's Audit, Risk and Compliance Committee and has been since July 2015.  Defendant McGovern knowingly or recklessly made improper statements in the Company's press releases and public filings.   PayPal paid defendant McGovern the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $113,000.00 | $220,002 | $333,002 |
| 2015 | $56,500 | - | $56,500 |

25.     Defendant Frank Yeary ("Yeary") is a PayPal director and has been since July 2015.  Defendant Yeary was also an eBay director from January 2015 to July 2015.  Defendant

Yeary is a member of PayPal's Audit, Risk and Compliance Committee and has been since July 2015. Defendant Yeary knowingly or recklessly made improper statements in the Company's press releases and public filing. PayPal paid defendant Yeary the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $98,000 | $220,002 | $318,002 |
| 2015 | $49,000 | - | $49,000 |

26.     Defendant David Dorman ("Dorman") is a PayPal director and has been since June 2015. Defendant Dorman was also an eBay director from June 2014 to July 2015. Defendant Dorman knowingly or recklessly made improper statements in the Company's press releases and public filings. PayPal paid defendant Dorman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $110,000 | $220,002 | $330,002 |
| 2015 | $52,500 | - | $52,500 |

27.     Defendant Jonathan Christodoro ("Christodoro") is a PayPal director and has been since July 2015. Defendant Christodoro was also an eBay director from March 2015 to July 2015. Defendant Christodoro knowingly or recklessly made improper statements in the Company's press releases and public filings. PayPal paid defendant Christodoro the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $98,000 | $220,002 | $318,002 |
| 2015 | $46,000 | - | $46,000 |

28.     Defendant Wences Casares ("Casares") is a PayPal director and has been since January 2016. Defendant Casares knowingly or recklessly made improper statements in the Company's press releases and public filings. PayPal paid defendant Casares the following compensation as a director:

1

2

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $95,055 | $220,002 | $315,057 |

3

4    29.   Defendant Patrick Dupuis ("Dupuis") was PayPal's Senior Vice President and

5   Interim CFO from July 2015 to August 2015.  Defendant Dupuis was also PayPal's CFO from

6   November 2010 to July 2015.  Defendant Dupuis knowingly, recklessly, or with gross

7   negligence made improper statements in the Company's press releases and public filings.  PayPal

8   paid defendant Dupuis the following compensation as an executive:

9

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2015 | $1,050,000 | $1,639,465 | $309,566 | $429,975 | $10,600 | $3,439,606 |

12    30.   The defendants identified in ¶¶19-20, 29 are referred to herein as the "Officer

13   Defendants."  The defendants identified in ¶¶19, 21-28 are referred to herein as the "Director

14   Defendants."  The defendants identified in ¶¶22, 24-25 are referred to herein as the "Audit, Risk

15   and Compliance Committee Defendants."  Collectively, the defendants identified in ¶¶19-29 are

16   referred to herein as the "Individual Defendants."

17                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

18   **Fiduciary Duties**

19    31.   By reason of their positions as officers and directors of the Company, each of the

20   Individual Defendants owed and owe PayPal and its stockholders fiduciary obligations of loyalty

21   and good faith, and were and are required to use their utmost ability to control and manage

22   PayPal in a fair, just, honest, and equitable manner.  The Individual Defendants were and are

23   required to act in furtherance of the best interests of PayPal and not in furtherance of their

24   personal interest or benefit.

25    32.   To discharge their duties, the officers and directors of PayPal were required to

26   exercise reasonable and prudent supervision over the management, policies, practices, and

27

28

- 8 -

controls of the legal and financial affairs of the Company. By virtue of such duties, the officers and directors of PayPal were required to, among other things:

      (a)    accurately inform stockholders of material events and business practices affecting the Company's financial results;

      (b)    act only in the best interests of the Company, not their own interests;

      (c)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

      (d)    remain informed as to how PayPal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

33.     In addition, PayPal adopted a code of ethics. The Company's Code of Business Conduct & Ethics (the "Code of Conduct") is supposed to "provide[] guidance on how we should conduct our business for the benefit of ourselves, our colleagues, our Company, our customers, our suppliers and our stockholders."

34.     The Code of Conduct highlights the obligation of the Company and its employees and directors to comply with the law, stating "We are accountable for our actions and we honor our commitments. Our shared goal of honest and ethical action in everything we do drives our success. We are committed to ensuring that every action we take is in full compliance with the law – and in keeping with our ethics."

35.     Concerning "Making Ethical Decisions," the Code of Conduct states that:

When you face difficult decisions at PayPal, take the time to think and consider the legal and ethical issues. Don't give in to pressure and rush your decision. Carefully consider the implications of your actions. Always ask:

- Is it honest and fair?

- Is it consistent with the Code and the law?

- Does it make you feel good about yourself and the Company?

- 9 -

1

- Would you feel comfortable reading about your action if it is reported in the media?

2

36.     The Code of Conduct also acknowledges the obligation for directors and officers

3

for themselves and the Company to keep "Accurate Accounts and Records," and, in particular,

4

states:

5

6

7

We have an obligation to our business, stockholders and others who rely on us, to ensure that our accounts and records are always complete, accurate, timely, and understandable. These records are critical for internal decision making, and for reporting to government agencies and the market. Accurate records protect our reputation for integrity.

8

9

10

This means that we never falsify, forge, backdate, or improperly alter any Company document. We ensure that all transactions are lawful, recorded in the proper account, and in accordance with all Company internal controls. All reports to regulatory authorities must be full, fair, accurate, timely and understandable.

11

37.     The Code of Conduct provides, as to "Public Statements and Endorsements," that:

12

13

We speak with one voice when communicating about PayPal to the media, financial analysts, or investors. Inaccurate statements can create serious risks for the Company, including claims of false advertising, misrepresentation, breach of contract, securities fraud and antitrust violations.

14

15

38.     The Code of Conduct also discusses the need for privacy for the Company's

16

customers, especially given the sensitive nature of PayPal's business. In particular, the Code of Conduct states:

17

18

19

20

21

22

23

Customers who entrust us with their personal information expect us to protect their privacy. Privacy matters at PayPal. We all must be focused on our customers, compliance and doing the right thing. Depending on your job responsibilities you may have access to our customers' personal data, including their contact details, financial account information and transaction data. We must safeguard our customers' information. We collect, access, use, store, transfer and share our customers' information only for legitimate business purposes, and always in accordance with our privacy and information security policies and applicable laws, rules and regulations, including data protection laws. In particular, PayPal has made commitments to data protection regulators in Europe that we, globally, will comply with certain binding rules designed to protect our Users' Personal Information.

24

25

26

We do not share customer information with third parties, or any colleague who doesn't have a business need to know. If there is a legitimate business need to share confidential information with a third party, they must first enter into an appropriate legal agreement, with confidentiality, privacy and security provisions, approved by the PayPal Legal and Privacy Teams.

27

28

- 10 -

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
Lead Case No. 3:17-cv-00162-RS

39.    The Code of Conduct addresses how the Company should treat advertising, stating:

> Every claim in our advertisements and marketing materials must be accurate, objective and verifiable. This means that we must research and document our claims prior to publication. Laws governing comparative advertising, including pricing, vary from country to country, so it's important to obtain guidance from Legal when making such claims to ensure that we comply with applicable laws.
>
> Advertising and marketing using social media also is subject to various regulations. Please consult our Social Media Policy and Legal for more information.
>
> We do not make false or misleading claims. Legal can provide guidance if you are unsure whether something is false or misleading.

**Breaches of Duties**

40.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of PayPal, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

41.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in issuance of the misleading statements, the illegal business practices, the attempted release of their own liability, improper practices that wasted the Company's assets, and caused PayPal to incur substantial damage.

42.    The Individual Defendants, because of their positions of control and authority as officers and directors of PayPal, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, PayPal has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit, Risk and Compliance Committee Defendants**

43.    In addition to these duties, under its Charter in effect, the Audit, Risk and

Compliance Committee Defendants, defendants McGovern, Moffett and Yeary, owed specific

duties to PayPal to assist the Board in overseeing the Company.  Specifically, the Audit, Risk

and Compliance Committee's Charter provides:

> The Audit, Risk and Compliance Committee … shall provide assistance and guidance to [the Board] in fulfilling its oversight responsibilities to the Company's stockholders with respect to (i) the Company's corporate accounting and financial reporting practices, … (iv) the quality and integrity of the Company's financial statements and reports, … (vii) overseeing the Company's overall risk framework and risk appetite framework and (viii) the Company's compliance with legal and regulatory requirements. In discharging these obligations, the Committee shall maintain and foster an open avenue of communication between the Committee and the independent auditors, the Company's financial management and internal auditors.

44.     Under the Audit, Risk and Compliance Committee's Charter, the members' duties

include:

> Review, upon completion of the audit, the financial statements to be included in the Company's Annual Report on Form 10-K;
>
> *   *   *
>
> Review with the Company's Chief Business Affairs & Legal Officer and/or Chief Compliance Officer, as applicable, any significant legal, compliance or regulatory matters that could have a material impact on the Company's financial statements or the Company's business, financial statements or compliance policies, including material notices to or inquiries received from governmental agencies;
>
> *   *   *
>
> Discuss earnings press releases;
>
> Review and discuss with management the Company's major risk exposures, including financial, operational, privacy, security, business continuity legal and regulatory risks, the steps the Company has taken to monitor, control, and manage and such exposures, and the Company's risk assessment and risk management policies; and regularly report to the Board the substance of such reviews and discussions;

45.     The Audit, Risk and Compliance Committee's members' responsibilities as it

comes to compliance were particularly robust under the Audit, Risk and Compliance Committee

Charter.  The Audit, Risk and Compliance Committee Charter stated that the members of the

Audit, Risk and Compliance Committee must:

> (a)     Periodically review the Company's Enterprise-Wide Compliance Risk Management Policy;

- 12 -

(b)    Periodically review the Company's Global Anti-Money Laundering and Sanctions Policy;

(c)    Review the Company's Annual Compliance Plan;

(d)    Review periodic reports from the Chief Compliance Officer, and other members of management as appropriate, regarding ongoing enhancements to, and overall effectiveness of, the Company's Enterprise-Wide Compliance Risk Management Program and the Company's Anti-Money Laundering and Sanctions Program;

(e)    Review management actions on significant compliance matters (e.g., actions taken to remediate significant compliance issues, progress of major compliance initiatives, and remediation progress of open regulatory actions) and the Company's compliance with applicable law and regulation;

(f)    Receive regulatory authorities' significant examination reports, or summaries of the same;

(g)    Receive reporting on any key organizational changes to ensure the Company's Compliance function has the appropriate size, skills, stature, and independence;

(h)    Receive and discuss reports from management regarding significant reported ethics violations under the Company's Code of Business Conduct and other corporate governance policies;

(i)    Receive and review reports on selected compliance topics as management or the committee deems appropriate;

(j)    Periodically review the Company's Code of Business Conduct; and

(k)    Review all requests for waivers of the Code of Business Conduct involving directors, executive officers, and executive staff members and make recommendations to the Board as to whether it should approve any such request.

46.    Concerning the Company's risk compliance, the Audit, Risk and Compliance Committee Charter requires the Audit, Risk and Compliance Committee members to:

(a)    Review the Company's overall risk management framework, including policies and practices established by management to identify, assess, measure and manage key risks facing the Company, including financial crimes risk, regulatory compliance risk, information security, technology risk, operational risk (including fraud losses), credit risk, market risk (including capital and liquidity), reputational risk, and strategic risk;

(b)    Review the Company's risk appetite framework which will support the Company's strategic plan, goals, and objectives;

(c)   Periodically review the Company's overall Risk Management Policy and other risk management policies, as appropriate;

(d)   Receive management reports regarding management's assessment of the effectiveness of the Company's overall risk program, including corrective actions taken by management to address risk issues (including those identified by management, internal audit, or regulatory reviews), the progress of key risk initiatives and the implementation of risk management enhancements;

(e)   Receive reporting on any key organizational changes to ensure the Company's Risk function has the appropriate size, skills, stature and independence; and

(f)   Receive and review reports on selected risk topics as management or the Committee deems appropriate.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of PayPal, regarding the Individual Defendants' management of PayPal's operations, including its subsidiary, Venmo; (ii) mislead the public about PayPal's compliance with applicable laws; and (iii) enhance the Individual Defendants' executive and directorial positions at PayPal and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

49.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements described herein.

- 14 -

50.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

51.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

52.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**IMPROPER FINANCIAL STATEMENTS**

53.     According to its public filings, PayPal operates as a technology platform company that enables digital and mobile payments on behalf of consumers and merchants worldwide.  It enables businesses of various sizes to accept payments from merchant websites, mobile devices, and applications, as well as at offline retail locations through a range of payment solutions.  The Company's platform allows customers to pay and get paid, transfer and withdraw funds to their bank accounts, and hold balances in their PayPal accounts in various currencies.

54.     Between 2002 and 2015, PayPal operated as a subsidiary of eBay, a multinational ecommerce company providing consumer-to-consumer and business-to-consumer payment solutions via the internet.

55.     On December 19, 2013, while PayPal was stilled owned by eBay, eBay announced that it would acquire Braintree for $800 million.  Braintree was best known for its mobile payment application, Venmo, which provided for peer to peer payments.  eBay announced that Braintree would operate as a separate service within PayPal.  In particular, eBay stated:

> eBay Inc. (NASDAQ: EBAY) today announced it completed its previously announced acquisition of Braintree, the innovative global payment platform powering the next generation of leading online and mobile-first startups. In accordance with the terms of the acquisition agreement announced September 26, 2013, eBay acquired Braintree for total consideration of approximately $800 million in cash.

> Braintree will now operate as a separate service within PayPal under the leadership of Braintree CEO Bill Ready, who will report to PayPal President David Marcus and has joined PayPal's executive staff.

> Braintree has become the payment platform of choice for next-generation innovators like Airbnb, OpenTable, HotelTonight and Uber, transforming consumer experiences through mobile devices. PayPal plans to integrate with Braintree only in ways that will benefit customers and support Braintree's growth.

> Venmo, Braintree's mobile application that gives people an easy way to pay each other using their mobile devices and leveraging social networks, is part of the acquisition and will remain a separate app.

56.     As a company that enables the transfer of money between individuals, PayPal and Venmo are subject to significant laws and government regulations in the United States and around the world.  In the United States, as admitted by the Company's Annual Reports on Forms 10-K filed with the SEC, much of PayPal's business falls under the purview of the Consumer Financial Protection Board ("CFPB"), which promulgates regulations that the Company must comply with.  The Company is also subject to anti-money laundering laws as well as laws that are meant to prevent terrorists from using PayPal's services to facilitate illegal activity.  PayPal must also comply with the Gramm-Leach-Bliley Act, which requires the maintenance of a written, comprehensive information security program, and state laws that require the protection of sensitive personal customer information.  Finally, the Company must not engage in any unfair

1  or deceptive trade practices, as doing so would violate numerous state laws and the Federal

2  Trade Commission Act.

3      57.     In light of myriad regulations imposed on PayPal, investors pay close attention to

4  the Company's comments about its compliance with laws and regulations and whether any

5  governmental agencies are investigating it.  Recognizing this fact, during the years that eBay

6  owned PayPal, eBay would inform the public about the laws and regulations which apply to

7  PayPal.  After the acquisition of Braintree, eBay would also include information concerning the

8  application of these laws to Venmo.  Unfortunately, unbeknownst to the public, Venmo was

9  violating these very same laws that certain of the Individual Defendants were discussing in the

10 SEC filings of eBay (and later PayPal) by engaging in unfair and deceptive trade practices.

11     58.     Because Venmo's business was inflated by its violations of state and federal

12 competition law, the financial results of eBay and later PayPal were also inflated.  In particular,

13 on January 31, 2014, eBay filed an Annual Report on Form 10-K with the SEC, announcing the

14 Company's financial and operating results for the quarter and year ended December 31, 2013,

15 which was signed by defendants Donahoe, Omidyar, and Moffett.  For the quarter, eBay reported

16 net income of $850 million on revenue of $4.5 billion.  For 2013, eBay reported net income of

17 $2.8 billion on revenue of $16 billion.  These amounts were inflated due to Venmo's illegal

18 business practices.

19     59.     Notably, defendants Donahoe, Omidyar, and Moffett  acknowledged in the Form

20 10-K that violating the law could cause PayPal and Venmo significant harm, stating "If PayPal

21 or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo

22 could be subject to liability and/or additional restrictions, forced to cease doing business with

23 residents of certain states, forced to change its business practices, or required to obtain additional

24 licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo."  The

25 filing discussed the laws and regulations that applied to PayPal and Venmo in additional detail,

26 stating:

27          To date, PayPal has obtained licenses to operate as a money transmitter (or its
           equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S.
           Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The

28

- 17 -

two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. Braintree's subsidiary Venmo provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash, but Venmo is also licensed as a money transmitter in California, has applied for a license in Hawaii, and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on its investment of customer funds, reporting requirements, bonding requirements, and inspection by state regulatory agencies. ***If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices, or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo***. Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept Pay Pal as a form of payment, which would further harm our business.

60.     eBay reiterated this same discussion in its Quarterly Report on Form 10-Q for the quarter ending March 31, 2014, filed with the SEC on May 1, 2014.  eBay also added a discussion about the CFPB and its effect on PayPal and Venmo.  In particular, eBay noted that the CFPB launched a complaints portal, which allows customers to make complaints directly to the CFPB online.  In addition, eBay reported a net loss of $2.3 billion on revenue of $4.2 billion. In particular, the Form 10-Q stated:

> To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash. Venmo is also licensed as a money transmitter in California and Washington, has applied for a license in Hawaii and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. ***If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo***. Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

*   *   *

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
Lead Case No. 3:17-cv-00162-RS

Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system. Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau), the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and Bill Me Later to make additional disclosures to their users and to impose new restrictions on certain of their activities. For example, in January 2012, the Consumer Financial Protection Bureau finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments. ***The Consumer Financial Protection Bureau also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints***. These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may otherwise adversely impact our business.

61.     On July 18, 2014, eBay filed a Quarterly Report on Form 10-Q for the quarter ended June 30, 2014, with the SEC.  The Form 10-Q again reiterated the discussion of the laws, agencies, and regulations that apply to PayPal and Venmo.  For the quarter, eBay reported net income of $676 million.  In particular, the Form 10-Q stated:

To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash. Venmo is also licensed as a money transmitter in California and Washington, has applied for a license in Hawaii and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. ***If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo***. Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

*   *   *

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
Lead Case No. 3:17-cv-00162-RS

Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system. Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau), the general effect of the financial reform law has been, and we expect will continue to be, to require Pay Pal and Bill Me Later to make additional disclosures to their users and to impose new restrictions on certain of their activities. For example, in January 2012, the Consumer Financial Protection Bureau finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments. *The Consumer Financial Protection Bureau also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints.* These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in otherwise adversely impact our business.

62.     On October 16, 2014, eBay filed a Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, with the SEC.  The Form 10-Q recognized the increased scrutiny the CFPB placed on money transfer services, like PayPal and Venmo, and that the agency was implementing new regulations on PayPal and Venmo.  In addition, for the quarter, eBay reported net income of $673 million on revenue of $4.3 billion.  In the Form 10-Q, it again discussed the varied laws in which PayPal and Venmo were subject to and the harm that would befall the Company if they were found to have violated them.  The Form 10-Q stated:

To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of PayPal, Inc. Venmo is also licensed as a money transmitter in California, Vermont and Washington and has applied for a license in Hawaii and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. *If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo.* Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

- 20 -

* * *

Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system. Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau, or CFPB), the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and PayPal Credit to make additional disclosures to their users and to impose new restrictions on certain of their activities. For example, in January 2012, the CFPB finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in Late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments. ***The CFPB also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints.*** These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may otherwise adversely impact our business.

63.     On February 6, 2015, eBay filed an Annual Report on Form 10-K for the quarter and year ended December 31, 2014, with the SEC.  The Form 10-K was signed by defendants Donahoe, Omidyar, Dorman, Moffett and Yeary.  For the quarter, eBay reported net income of $1 billion on revenue of $4.9 billion.  For 2014, eBay reported net income of $46 million on revenue of $17.9 billion.  These results were inflated due to Venmo's illegal business practices. In addition, the Form 10-K again discussed the laws and regulations in which PayPal and Venmo are subject, stating:

PayPal has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. PayPal's subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, PayPal and Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change their business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if they violate these laws or regulations.

64.     On April 23, 2015, eBay filed a Quarterly Report on Form 10-Q for the quarter ended March 31, 2015, with the SEC.  For the quarter, eBay reported net income of $626 million

on revenue of $4.4 billion.  The Form 10-Q reiterated the discussion of the laws and regulations

applicable to PayPal and Venmo, stating:

> PayPal has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. PayPal's subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, PayPal and Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change their business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if they violate these laws or regulations.

65.     On July 17, 2015, eBay spun off its PayPal units to Plaintiffs and eBay's other

stockholders.  As part of the spinoff, eBay's stockholders received one share of PayPal stock for

each share of eBay stock they owned.  PayPal's stock began trading on the NASDAQ on

July 20, 2015.

66.     Despite PayPal becoming a separately traded company, the Individual Defendants

continued to make improper statements in the Company's filings.  In particular, PayPal continued

to report inflated numbers based on Venmo's illegal business practices, while at the same time

acknowledging that the Company's business is subject to significant regulatory scrutiny.

67.     PayPal's first quarterly statement as a standalone company occurred on July 29,

2015.  On that date, PayPal filed its Quarterly Report on Form 10-Q for the quarter ended June

30, 2015, with the SEC.  For the quarter, the Company reported net income of $305 million on

revenue of $2.2billion.  Concerning the laws and regulations which the Company is subject to

(and impliedly complying with), the Form 10-Q stated:

> PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. Our subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Venmo are subject to restrictions with respect to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if we violate these laws or regulations.

68.     The Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") by defendants Schulman and Dupuis, which stated:

I, [Daniel H. Schulman/Patrick L.A. Dupuis], certify that:

1.  I have reviewed this report on Form 10-Q of PayPal Holdings, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

- 23 -

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*   *   *

I, [Daniel H. Schulman/Patrick L.A. Dupuis], hereby certify pursuant to 18 U.S.C. Section 1350 adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

    (i)  The accompanying quarterly report on Form 10-Q for the quarter ended June 30, 2015 fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and

    (ii) The information contained in such report fairly presents, in all material respects, the financial condition and results of operations of PayPal Holdings, Inc.

    69.    On October 29, 2015, PayPal filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2015, with the SEC. PayPal reported net income of $301 million on revenue of $2.2 billion. The Form 10-Q acknowledged that violations of regulations and laws applying to Venmo and PayPal could significantly disrupt and damage the Company. In particular, the Form 10-Q stated:

In the United States, PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the states where it is required, as well as in the District of Columbia, the U.S. Virgin Islands and Puerto Rico. Our subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states, and acts as an authorized delegate and agent of PayPal in the states where Venmo is not directly licensed. As licensed money transmitters PayPal and Venmo are subject to restrictions with respect to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, if we violate these laws or regulations, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required

- 24 -

1    to obtain additional licenses or regulatory approvals that could impose substantial costs.

2    70.    The Form 10-Q contained signed SOX Certifications by defendants Schulman and

3    Rainey, which were substantially similar to those set forth above.

4    71.    On February 11, 2016, PayPal filed its Annual Report on Form 10-K for the

5    quarter and year ended December 31, 2015, with the SEC.   The Form 10-K was signed by

6    defendants Schulman, Rainey, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett,

7    Omidyar and Yeary.   PayPal reported net income of $367 million on revenue of $2.5 billion for

8    the quarter.   For 2015, PayPal reported net income of $1.2 billion on revenue of $9.2 billion.

9    The Form 10-K contained similar disclosures concerning the laws and regulations applicable to

10   PayPal and its subsidiaries as the Company's other filings.   In particular, the Form 10-K stated:

11   > In the United States, PayPal, Inc. has obtained licenses to operate as a money
12   > transmitter (or its equivalent) in the states where it is required, as well as in the
     > District of Columbia, the U.S. Virgin Islands and Puerto Rico. This license
13   > includes not only the PayPal branded products and services in these states, but
     > also our Venmo branded products and services. Our subsidiary, Xoom, is also
14   > licensed as a money transmitter in certain U.S. states. As licensed money
     > transmitters, PayPal and Xoom are subject to restrictions with respect to their
15   > investment of customer funds, reporting requirements, bonding requirements and
     > inspection by state regulatory agencies. Accordingly, if we violate these laws or
16   > regulations, we could be subject to liability and/or additional restrictions, forced
     > to cease doing business with residents of certain states, forced to change our
17   > business practices or be required to obtain additional licenses or regulatory
     > approvals that could impose substantial costs.

18   72.    The Form 10-K contained SOX Certifications signed by defendants Schulman and

19   Rainey, which were substantially similar to those set forth above.

20   73.    The Individual Defendants' statements above were improper.   The statements

21   failed to disclose material adverse facts about the Company's business and compliance with the

22   law concerning Venmo's illegal business practices, which in turn inflated the above specified

23   financial results.

24                          **THE MISLEADING PROXY**

25   74.    On April 14, 2016, defendants Casares, Christodoro, Donahoe, Dorman,

26   McGovern, Moffett, Omidyar, Schulman and Yeary issued to stockholders a Proxy Statement on

27   Form DEF 14A (the "Proxy") that contained materially misleading statements.   Plaintiffs'

28

- 25 -

1    allegations with respect to the misleading statements in the Proxy are based solely on negligence;

2    they are not based on any allegation of reckless or knowing conduct by or on behalf of these

3    defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any

4    allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or

5    recklessness with regard to these allegations and related claim.

6        75.    In the Proxy, defendants Casares, Christodoro, Donahoe, Dorman, McGovern,

7    Moffett, Omidyar, Schulman and Yeary solicited stockholder votes to reelect themselves to the

8    Board.   In support of their bid for reelection, defendants Casares, Christodoro, Donahoe,

9    Dorman, McGovern, Moffett, Omidyar, Schulman and Yeary highlighted their supposed

10   successful oversight of the Company.  In particular, the Proxy described their responsibilities, the

11   duties of each committee, their active role in risk management, and touted PayPal and the

12   Board's "strong governance standards" in multiple places in the Proxy.  In addition, defendants

13   Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar, Schulman and Yeary

14   claimed that "the Board is committed to good corporate governance."

15       76.    Defendants Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett,

16   Omidyar, Schulman and Yeary's statements in the Proxy were incorrect.  The Board was not

17   committed to strong or even good corporate governance.  Rather, Venmo was engaging in unfair

18   trade practices.  In fact, the Company had already received a civil investigative demand from the

19   SEC about Venmo's deceptive practices before making the misleading statements in the Proxy.

20   Thus, defendants Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar,

21   Schulman and Yeary should have been aware of the deficiencies in their corporate governance at

22   the time of the Proxy.

23       77.    In addition, throughout the Proxy, defendants Casares, Christodoro, Donahoe,

24   Dorman, McGovern, Moffett, Omidyar, Schulman and Yeary routinely used the Company's

25   supposed "regulatory achievements" as a performance factor in justifying executive

26   compensation.  For instance, in justifying the executive compensation awarded to the Company's

27   Chief Legal Officer, A. Louise Pentland, the Proxy specifically cited the following factors:

28

(1) Lead compliance with financial and regulatory requirements; (2) Lead corporate governance initiatives to reflect best practices; and (3) Provide effective legal support related to acquisitions and integration.

78.     Further, the Proxy additionally touted the Audit Committee's supposed achievements over the prior year, which included the following:

- Inquired about significant business, regulatory, and financial reporting risks, reviewed PayPal's policies for risk assessment and risk management, and assessed the steps management is taking to control these risks;

- Reviewed the Company's compliance management system to increase its oversight in this area; and

- Reviewed with the Chief Legal Officer matters that may have a material impact on the combined and consolidated financial statements or internal control over financial reporting and the effectiveness of the Company's compliance program, and regularly received status reports of compliance issues.

79.     Thus, because defendants Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar, Schulman and Yeary affirmatively put the Company's "regulatory compliance" at issue in multiple places, they were necessarily required to disclose the Company's regulatory problems (*i.e.*, the FTC's investigation and receipt of the CID).

80.     The statements about the Board governance practices were the essential link to stockholders reelecting defendants Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar, Schulman and Yeary to the Board and in approving the executive compensation awarded.   Indeed, the multiple mentions of the Company and Board's supposed "strong governance standards" and "regulatory compliance" demonstrates that the defendants themselves thought these statements were material to stockholders.

## THE TRUTH BEGINS TO EMERGE

81.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge on April 28, 2016, when PayPal filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2016.  In the filing, PayPal disclosed that it received a CID from the FTC.  The CID revealed that the FTC was investigating whether Venmo engaged in

1    deceptive or unfair practices in violation of the Federal Trade Commission Act.  In particular, the

2    Form 10-Q stated:

3           On March 28, 2016, we received a [CID] from the [FTC] as part of its
            investigation to determine whether we, through our Venmo service, have been or

4           are engaged in deceptive or unfair practices in violation of the Federal Trade
            Commission Act. The CID requests the production of documents and answers to

5           written questions related to our Venmo service. We are cooperating with the FTC
            in connection with the CID. The CID could lead to an enforcement action and/or

6           one or more consent orders, which may result in substantial costs, including legal
            fees, fines, penalties, and remediation expenses and actions, and could require us

7           to change aspects of the manner in which we operate Venmo.

8           82.    On this news, the Company's market capitalization fell over $1 billion.

9           83.    A month later, on May 20, 2016, Texas Attorney General, Ken Paxton,

10   announced a settlement with PayPal over Venmo's business practices.  In particular, the Texas

11   Attorney General explained that, among other things, Venmo misrepresented information to

12   customers and used customers' phone contacts without adequate explanation, in violation of

13   Texas law.  A statement from the Attorney General's office stated:

14          The Texas Attorney General's Consumer Protection Division conducted an
            investigation for potential violations of the Texas Deceptive Trade Practices Act

15          (DTPA) and found a number of issues regarding the safety and security of the
            Venmo app. According to investigators, Venmo used consumers' phone contacts

16          without clearly disclosing how the contacts would be used, did not clearly
            disclose how consumers' transactions and interactions with other users would be

17          shared, and misrepresented that communications from Venmo were actually from
            particular Venmo users. As a result, consumers may have publically exposed

18          private information regarding their payments. In January 2016 alone, Venmo
            processed $1 billion in transactions.

19
            As part of its settlement, PayPal agrees that its Venmo app will improve

20          disclosures to consumers regarding privacy and security. Paypal also agrees to
            better inform users of the safeguards available on its app, and ensure consumers

21          understand who will be able to view their transaction information. The settlement
            also includes a payment of $175,000 to the State of Texas.

22
            84.    On the news of PayPal's settlement with Texas over Venmo's apparent illegal

23
     business practices, the Company's market capitalization fell another $145 million.

24
            85.    The Company continues to be extremely vague about the FTC investigation.

25
     However, it has admitted in its most recent Annual Report on Form 10-K, filed with the SEC on

26
     February 7, 2018, that the FTC's investigation is continuing.

27

28
                                            - 28 -

**INSIDER SALES BY DEFENDANT DONAHOE**

86.     Rather than providing the market with correct information, defendant Donahoe used his knowledge of PayPal's material, nonpublic information to sell his personal holdings while the Company's stock was artificially inflated.   As officers and directors of PayPal, defendant Donahoe was privy to material, nonpublic information about the Company's true business health.

87.     While in possession of this knowledge, defendant Donahoe sold over 1.8 million shares of his personally held PayPal stock for proceeds of over $70 million.  His sales were timed to maximize profit from PayPal's then artificially inflated stock price.

88.     Defendant Donahoe's sales are particularly suspicious given that his stock sales represented over 93% of his holdings as demonstrated by the table below:

**Insider Name: DONAHOE (PayPal)**

| | |
|---|---|
| Shares Sold During SP | 1,830,584 |
| Shares Remaining After Sales | 128,749 |
| Total Shares Before Sales | 1,959,333 |
| **Total Proceeds from Sales** | **$70,273,773.04** |
| **% of Total Ownership Sold During SP** | **93.43%** |

89.     In sum, defendant Donahoe sold over $70 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **DONAHOE** | 7/27/2015 | 5,895 | $36.85 | $217,230.75 |
| | 7/27/2015 | 369,948 | $36.71 | $13,580,791.08 |
| | 7/27/2015 | 4,700 | $37.29 | $175,263.00 |
| | 7/31/2015 | 764,453 | $38.59 | $29,500,241.27 |
| | 8/5/2015 | 507,251 | $39.45 | $20,011,609.93 |
| | 8/10/2015 | 65,486 | $39.19 | $2,566,717.22 |
| | 8/10/2015 | 37,975 | $39.19 | $1,488,395.95 |
| | 11/5/2015 | 21,486 | $37.14 | $797,992.19 |
| | 11/20/2015 | 53,390 | $36.25 | $1,935,531.65 |
| | | **1,830,584** | | **$70,273,773.04** |

## DAMAGES TO PAYPAL

90.     As a result of the Individual Defendants' improprieties, PayPal disseminated improper, public statements concerning the Company's legal compliance and earnings results. These improper statements have devastated PayPal's credibility as reflected by the Company's almost $16 billion, or nearly 30%, market capitalization loss.

91.     PayPal's performance issues also damaged its reputation within the business community and in the capital markets.  PayPal's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

92.     Further, Venmo's credibility with customers is severely affected, as they now believe the Company used its improper business practices to take advantage of them.  The Company also faces a potential consumer class action on behalf of those customers that used Venmo that were taken advantage of.

93.     Also, defendant Donahoe utilized the Company's material, nonpublic information to benefit himself by selling his personally held stock at prices that he knew were inflated.

94.     Further, as a direct and proximate result of the Individual Defendants' actions, PayPal has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred from responding to the CID;

(b)     costs incurred from defendants and settling any state or federal actions over Venmo's illegal business practices, including the Texas state action; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to PayPal.

## DERIVATIVE ALLEGATIONS

95.     Plaintiffs incorporate the above paragraphs as if fully set forth herein.

1    96.    Pursuant to Del. Ch. Ct. R. 23.1, Plaintiffs bring this action derivatively on

2   behalf of PayPal to redress injuries suffered, and yet to be suffered, by the Company as a

3   proximate result of Defendants' violations of securities laws, breaches of fiduciary duty, waste of

4   corporate assets, and unjust enrichment.

5    97.    The PayPal Board has eleven members.    They are defendants Casares,

6   Christodoro, Donahoe, Dorman, McGovern, Moffett, Schulman and Yeary, and non-defendants

7   Rodney C. Adkins, Belinda Johnson and Ann M. Sarnoff.

8    98.    On July 31, 2017, Plaintiffs designated the complaint filed by plaintiff Liss on

9   April 28, 2017, as the operative complaint in this action.  PayPal subsequently moved to dismiss

10  that complaint on the grounds that Plaintiffs had not made a demand upon the PayPal Board.  On

11  January 18, 2018, the Court dismissed the complaint for failure to make a demand on the PayPal

12  Board, with leave to amend.

13   99.    On February 15, 2018, to cure this perceived pleading defect, Plaintiffs served

14  the Demand upon the PayPal Board, and thereafter forwarded the Demand to its counsel in this

15  action.  *See* Exhibit A hereto.  The Demand in general demands that PayPal investigate and bring

16  appropriate legal action against the Individual Defendants named herein related to the facts

17  alleged herein.

18   100.    PayPal has not yet had an opportunity to respond to the Demand.    The

19  proceedings in this action should be temporarily stayed to enable PayPal time to do so.

20  **COUNT I**

21  **Against the Director Defendants for Violations of**

22  **Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

23   101.    Plaintiffs incorporate by reference and reallege each and every allegation

24  contained above, as though fully set forth herein, except for any allegation based on fraud,

25  scienter, or recklessness.

26   102.    The Director Defendants disseminated the false and misleading Proxy specified

27  above, which failed to disclose material facts necessary in order to make the statements made, in

28  light of the circumstances under which they were made, not misleading.

103.    The Proxy was prepared, reviewed, and/or disseminated by the Director Defendants.  It misrepresented and/or omitted material facts, including material information about the Company's business prospects and falsely touted the Board's "strong governance standards."

104.    In addition, throughout the Proxy, the Director Defendants routinely used the Company's supposed "regulatory achievements" as a performance factor in justifying executive compensation.  Further, the Proxy touted the supposed achievements of the Audit Committee, which purported included, *inter alia*, reviewing "the Company's compliance management system to increase its oversight in this area."

105.    In so doing, the Director Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

106.    The Director Defendants were negligent in filing the Proxy with these materially false and misleading statements.

107.    The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on whether to reelect defendants Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar, Schulman and Yeary to the Board and to approve of the Company's executive compensation policies.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

108.    By reason of the foregoing, the Director Defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

109.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy as described herein.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

110.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

111.    The Individual Defendants owed and owe PayPal fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe PayPal the highest obligation of good faith, fair dealing, loyalty, and due care.

112.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within PayPal, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

113.    In addition, defendant Donahoe breached his duty of loyalty by selling his personally held PayPal stock on the basis of material, nonpublic information.

114.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PayPal has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

115.    Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

116.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

117.    As a result of the above, the Individual Defendants have caused PayPal to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

118.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

1   119.   Plaintiffs, on behalf of PayPal, have no adequate remedy at law.

2                                  **COUNT IV**

3              **Against the Individual Defendants for Unjust Enrichment**

4   120.   Plaintiffs incorporate by reference and reallege each and every allegation

5   contained above, as though fully set forth herein.

6   121.   By their wrongful acts and omissions, the Individual Defendants were unjustly

7   enriched at the expense of and to the detriment of PayPal.  The Individual Defendants were

8   unjustly enriched as a result of the compensation and director remuneration they received while

9   breaching fiduciary duties owed to PayPal.

10   122.   Defendant Donahoe sold PayPal stock while in possession of material, nonpublic

11   information that artificially inflated the price of PayPal stock.  As a result, defendant Donahoe

12   profited from his misconduct and was unjustly enriched through his exploitation of material and

13   adverse inside information.

14   123.   Plaintiffs, as stockholders and representatives of PayPal, seek restitution from

15   these defendants, and each of them, and seeks an order of this Court disgorging all profits,

16   benefits, and other compensation obtained by these defendants, and each of them, from their

17   wrongful conduct and fiduciary breaches.

18   124.   Plaintiffs, on behalf of PayPal, have no adequate remedy at law.

19                              **PRAYER FOR RELIEF**

20   WHEREFORE, Plaintiffs, on behalf of PayPal, demand judgment as follows:

21   A.   Temporarily staying this action pending the Board's response to the Demand;

22   B.   Declaring that plaintiffs may maintain this action on behalf of PayPal and that

23   plaintiffs are adequate representatives of the Company;

24   C.   Against all of the defendants and in favor of the Company for the amount of

25   damages sustained by the Company as a result of the defendants' violation of securities law,

26   breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

27   D.   Directing PayPal to take all necessary actions to reform and improve its corporate

28

- 34 -

governance and internal procedures to comply with applicable laws and to protect PayPal and its

stockholders from a repeat of the damaging events described herein, including, but not limited to,

putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or

Articles of Incorporation and taking such other action as may be necessary to place before

stockholders for a vote of the following Corporate Governance Policies:

1. a proposal to strengthen the Company's compliance with fair competition laws;

2. a proposal to strengthen the Company's controls over financial reporting;

3. a provision to prevent insider selling;

4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

5. a provision to permit the stockholders of PayPal to nominate at least three candidates for election to the Board; and

6. a proposal to strengthen PayPal's oversight of its disclosure procedures.

E. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of PayPal has an effective remedy;

F. Awarding to PayPal restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

G. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H. Granting such other and further relief as the Court deems just and proper.

1

## JURY DEMAND

2      Plaintiffs demand a trial by jury.

3   Dated: February 16, 2018                    **ROBBINS ARROYO LLP**
                                                BRIAN J. ROBBINS
4                                               FELIPE J. ARROYO
                                                SHANE P. SANDERS
5                                               SCOTT F. TEMPLETON

6                                                        */s/ Shane P. Sanders*
7                                                        SHANE P. SANDERS

8                                               600 B Street, Suite 1900
                                                San Diego, CA 92101
9                                               Telephone: (619) 525-3990
                                                Facsimile (619) 525-3991
10                                              E-mail: brobbins@robbinsarroyo.com
                                                        farroyo@robbinsarroyo.com
11                                                      ssanders@robbinsarroyo.com
                                                        stempleton@robbinsarroyo.com
12
                                                **PROMISLOFF & CIARLANTO, P.C.**
13                                              JEFFREY J. CIARLANTO
                                                DAVID M. PROMISLOFF
14                                              5 Great Valley Parkway, Suite 210
                                                Malvern, PA 19355
15                                              Telephone: (215) 259-5156
                                                Facsimile: (215) 600-2642
16                                              E-mail: ciarlanto@prolawpa.com
                                                        david@prolawpa.com
17
                                                *Co-Lead Counsel for Plaintiffs*
18
                                                **ROBBINS GELLER RUDMAN**
19                                              **& DOWD LLP**
                                                SHAWN A. WILLIAMS
20                                              Post Montgomery Center
                                                One Montgomery Street, Suite 1800
21                                              San Francisco, CA 94104
                                                Telephone: (415) 288-4545
22                                              Facsimile (415) 288-4534
                                                E-mail: shawnw@rgrdlaw.com
23
                                                **ROBBINS GELLER RUDMAN**
24                                              **& DOWD LLP**
                                                TRAVIS E. DOWNS III
25                                              BENNY C. GOODMAN III
                                                ERIK W. LUEDEKE
26                                              655 West Broadway, Suite 1900
                                                San Diego, CA 92101
27                                              Telephone: (619) 231-1058
                                                Facsimile: (619) 231-7423
28                                              E-mail: travisd@rgrdlaw.com

- 36 -

1

bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

2

**THE BROWN LAW FIRM, P.C.**
TIMOTHY W. BROWN

3

240 Townsend Square
Oyster Bay, NY 11771

4

Telephone: (516) 922-5427
Facsimile: (516) 344-6204

5

E-mail: tbrown@thebrownlawfirm.net

6

**LAW OFFICE OF ALFRED G.**
**     YATES, JR., P.C.**

7

Alfred G. Yates, Jr.
Gerald L. Rutledge

8

300 Mt. Lebanon Boulevard, Suite 206-B
Pittsburgh, PA 15234

9

Telephone: (412) 391-5164
Facsimile: (412) 471-1033

10

E-mail: yateslaw@aol.com

11

*Additional Counsel for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1242831

27

28

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
Lead Case No. 3:17-cv-00162-RS

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on February 16, 2018, I electronically filed the foregoing with the

3    Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-

4    mail addresses on the Notice of Electronic Filing for this action.

5

6                                                                    /s/ *Shane P. Sanders*
                                                             SHANE P. SANDERS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
Lead Case No. 3:17-cv-00162-RS

VERIFICATION

I, Stephen Silverman, hereby declare as follows:

I am a stockholder of PayPal, Inc. and have been a stockholder continuously since eBay, Inc. spun off PayPal into a separate publicly traded company. I have retained competent counsel and am ready, willing, and able to pursue this action vigorously on behalf of PayPal, Inc. I have reviewed the Verified Amended Stockholder Derivative Complaint (the "Complaint"). Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:   February 15, 2018

STEPHEN SILVERMAN

## VERIFICATION

I, Steve Seeman, hereby declare as follows:

I am a stockholder of PayPal, Inc. and have been a stockholder continuously since eBay, Inc. spun off PayPal into a separate publicly traded company. I have retained competent counsel and am ready, willing, and able to pursue this action vigorously on behalf of PayPal, Inc. I have reviewed the Verified Amended Stockholder Derivative Complaint (the "Complaint"). Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:    2 - 14- 18

STEVE SEEMAN

VERIFICATION

I, Steve Sims, hereby declare as follows:

I am a stockholder of PayPal, Inc. and have been a stockholder continuously since eBay, Inc. spun off PayPal into a separate publicly traded company.  I have retained competent counsel and am ready, willing, and able to pursue this action vigorously on behalf of PayPal, Inc.  I have reviewed the Verified Amended Stockholder Derivative Complaint (the "Complaint").  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _15 FEB 18_

_____
STEVE SIMS

## VERIFICATION

I, Dennis Kramer as Administrator of the Iron Workers Local No. 25 Pension Fund, hereby declare as follows:

The Iron Workers Local No. 25 Pension Fund is a stockholder of PayPal, Inc. and has been a stockholder continuously since eBay, Inc. spun off PayPal into a separate publicly traded company.  The fund has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of PayPal, Inc.  I have reviewed the Verified Amended Stockholder Derivative Complaint (the "Complaint").  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: <u>FEBRUARY 15, 2018</u>

IRON WORKERS LOCAL NO. 25
PENSION FUND

By: _____
DENNIS KRAMER, Administrator